**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| Jennifer Spivey Foley, as Personal Representative of the Estate of Scott Ryan Spivey, Deborah Spivey, individually, and Byron Spivey, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>Brandon Strickland, Alan Jones, Damon Vescovi, Kerry Higgs, Daniel Spencer, Mark Johnson, Randall Ghent, Doug Dishong, Matthew Stephenson, Greg Lent, Mick Kathman, Joseph Hill, John Sotile, and Horry County,<br><br>Defendants. | C/A No.: 4:26-cv-______________<br><br>**COMPLAINT**<br>**(42 U.S.C. § 1983, et seq.)**<br>**(Jury Trial Demanded)** |

Plaintiffs, by and through their undersigned attorneys and complaining of the Defendants herein, allege and plead the following:

**INTRODUCTION**

1. This civil-rights action arises from a coordinated misuse of Horry County law-enforcement authority following the September 9, 2023, shooting death of Scott Ryan Spivey. Plaintiffs allege that Horry County/Horry County Police Department officers and supervisors, acting under color of state law, steered the investigation to protect favored private actors, manipulated or concealed evidence, abused and mistreated the remains of Scott Spivey to further their illegal efforts, coached witnesses, interfered with recording and preservation requirements, and thereafter concealed the resulting misconduct.

2. Plaintiffs bring claims under 42 U.S.C. § 1983. Jennifer Spivey Foley, in her representative capacity, asserts claims arising from intentional interference with the Estate's and

statutory beneficiaries' meaningful access to civil judicial redress and deprivation of the Estate's and statutory beneficiaries' protected property interest without due process. Deborah and Byron Spivey, the mother and father of Scott Spivey, individually assert a separate claim arising from the alleged intentional mistreatment, indignity, and concealment concerning their son's remains and the deprivation of their state-created quasi-property interest in the custody, protection, and dignified disposition of his body. Plaintiffs also assert supervisory liability against Defendant Joseph Hill and municipal liability against Horry County based on the theories pleaded below.

**PRELIMINARY STATEMENT OF CASE, PARTIES & JURISDICTION**

3. Plaintiff Jennifer Spivey Foley (hereinafter Plaintiff PR), a citizen and resident of Columbus County, North Carolina, is the sister of Scott Ryan Spivey ( "Spivey") and the duly appointed Personal Representative of the Estate of Scott Ryan Spivey (the "Estate"). She brings the Estate-related claims alleged herein solely in her representative capacity except to the extent a personal injury to her is expressly alleged. Spivey died without a spouse or children. Deborah and Byron Spivey are his parents, next of kin, and sole statutory beneficiaries under S.C. Code Ann. § 15-51-20.

4. Plaintiffs Deborah and Byron Spivey are citizens and residents of North Carolina. They sue individually for injuries to rights personal to them as Scott Spivey's parents and next of kin, including their alleged quasi-property interest under South Carolina law in the custody, protection, dignified treatment, and disposition of their deceased son's remains. They do not purport to prosecute any Estate-related action in their individual names; that action remains prosecuted by the Personal Representative for their benefit as required by applicable law.

5. At all relevant times herein, each individual Defendant was employed as a law-enforcement officer or supervisory law-enforcement official by the Horry County Police

Department ( “HCPD”). Each is sued in his or her individual capacity for personal participation in, facilitation of, direction of, or deliberate indifference to the constitutional violations alleged below, as specifically set forth herein with respect to each such Defendant. To the extent specific factual allegations concerning a particular Defendant’s personal conduct are not yet available, Plaintiffs reserve the right to amend this complaint to add or supplement allegations as additional facts are developed, consistent with Federal Rule of Civil Procedure 15.

6. Defendant Horry County is a political subdivision of the State of South Carolina and is the governmental entity responsible for HCPD. HCPD is a department of Horry County and is referenced herein to identify the County police department, its personnel, command structure, policies, practices, records, and conduct. HCPD is not separately named as a Defendant; allegations concerning acts or omissions of HCPD as an entity are allegations concerning Horry County acting through its police department and authorized personnel.

7. The majority of the events giving rise to this litigation took place in Horry County, South Carolina, within the Florence Division of the District of South Carolina.

8. Plaintiff Jennifer Spivey, in her capacity as Personal Representative of the Estate, alleges violations of federal constitutional rights under 42 U.S.C. § 1983 arising from Defendants’ conduct under color of state law, including intentional interference with protected property interests and meaningful access to the courts through evidence manipulation, concealment, destruction, fabrication, witness coaching, misuse of investigative authority, and obstruction of Plaintiff’s rights to obtain legal redress. Plaintiffs Deborah and Byron Spivey, in their individual capacities, allege violation of their federal constitutional rights under 42 U.S.C. § 1983 arising from Defendants’ conduct under color of state law, including intentional abuse and mishandling of their protected quasi-property interest in Scott Spivey’s remains.

9. At all relevant times, the individual Defendants acted under color of state law by using authority, access, information, equipment, command structure, investigative powers, and official responsibilities made possible by their positions with HCPD. The individual Defendants are sued for their own conduct; supervisory liability is alleged only where the required personal knowledge, deliberate indifference or tacit authorization, and causal connection are specifically pleaded.

10. The individual Defendants are sued in their individual capacities under 42 U.S.C. § 1983 for the acts and omissions attributed to each of them. Plaintiffs do not seek to impose individual liability merely because of employment by HCPD or supervisory status.

11. Defendant Horry County is sued under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) for constitutional violations allegedly caused by municipal policies, customs, usages, practices, delegated authority, failures of training, failures of supervision and discipline, ratification, and deliberate indifference to known or obvious investigative misconduct. Plaintiffs allege that Horry County, acting through HCPD and its authorized command structure, permitted bureau-level command personnel to exercise effectively final operational authority over criminal investigations without meaningful review, allowed command personnel to steer investigations for personal reasons, protected favored persons, tolerated evidence and body-camera irregularities, failed to enforce crime-scene and witness-separation requirements, and failed to discipline or retrain officers after known violations.

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over any properly pleaded related state-law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in Horry County, South Carolina.

## NATURE OF ACTION

14. Plaintiffs' federal claims are brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, including its Due Process Clause and the right of meaningful access to the courts. To the extent the right of access to courts is also protected by the Petition Clause of the First Amendment as incorporated through the Fourteenth Amendment, Plaintiffs invoke that protection as well. The Personal Representative alleges intentional obstruction of meaningful access to the courts and interference with protected litigation-related property interests through evidence manipulation, concealment, destruction, fabrication, witness coaching, and misuse of investigative authority. Spivey's parents separately allege deprivation, under color of state law, of their South Carolina-created quasi-property interest in the custody, protection, and dignified treatment of Spivey's remains. Plaintiffs allege the individual Defendants acted jointly and in concert under color of state law as described herein.

15. At all relevant times, Plaintiff PR possessed state law wrongful death and survival causes of action arising from Scott Spivey's death and a federal constitutional right of meaningful access to the courts to pursue legal redress of the claims. Plaintiff PR alleges Defendants knew that manipulation, concealment, destruction, or fabrication of material evidence could foreseeably impair those rights.

16. At all relevant times, Plaintiffs Deborah and Byron Spivey possessed a recognized quasi-property interest in the remains of Scott Spivey and allege that Defendants knew of their

right and that their actions would cause injuries and damages to Plaintiffs Deborah and Byron Spivey.

17. Plaintiffs allege that Defendants had actual or constructive knowledge that the investigative conduct described below created a substantial risk of constitutional injury and that, despite that knowledge, they intentionally participated in the misconduct, tacitly authorized it, or responded with deliberate indifference, causing the injuries alleged herein.

18. Plaintiffs allege that they did not consent to or waive the constitutional protections implicated by Defendants' conduct.

19. Plaintiffs allege that Defendants intentionally, recklessly, and with deliberate indifference engaged in the conduct described below, resulting in the impairment of Plaintiff PR's ability to pursue meaningful legal redress and causing actual and compensable injury, including litigation expense, delay, frustration, and burden incurred in discovering and attempting to correct Defendants' misconduct, as well as mental anguish, humiliation, anger, distress, and emotional suffering caused by the constitutional misconduct itself. Plaintiff PR does not seek to attribute to these Defendants the grief naturally arising from Spivey's violent and unexpected death; rather, Plaintiff PR alleges a separate and additional emotional injury caused by learning that public officials entrusted with honestly investigating his killing instead manipulated and corrupted the investigation, concealed or destroyed evidence, assisted or protected the persons responsible for his death. Plaintiffs Deborah and Byron Spivey allege the Defendants intentionally and with indifference subjected Spivey's remains to indignity and mistreatment in furtherance of the objectives alleged herein and thereby caused them extreme emotional suffering. Plaintiffs further allege that the continuing need to uncover, confront, and litigate the alleged misconduct has itself prolonged and compounded the trauma of Spivey's death. Rather than being permitted to begin an

ordinary process of grieving and healing, Plaintiffs have repeatedly been forced to devote their time and emotional energy to challenging the conduct of the very law-enforcement institution entrusted to investigate and protect their interests; and, as to Plaintiffs, that continuing struggle has interfered with their ability to begin healing from Spivey's loss and has repeatedly renewed and intensified the emotional injury caused by Defendants' own alleged acts. Plaintiffs further allege that this separate emotional injury includes the anguish of learning of and personally viewing video depicting Spivey's body being baked in a hot vehicle and then violently jostled and thrown about inside his vehicle while it remained in official custody and was being unloaded at the garage, as well as the recurring distress caused by having those images become part of the family's effort to discover what happened and obtain accountability.

## FACTUAL ALLEGATIONS

20. On September 9, 2023, Spivey was driving his 2021 black Chevrolet Silverado truck on Highway 9 in Horry County, South Carolina.

21. At approximately 5:48 p.m., when Spivey was driving near the intersection of Highway 57 and Highway 9, Weldon Boyd ("Boyd"), who was driving a 2022 Dodge Ram TRX truck in the same direction as Spivey, began to pursue and chase Spivey. Brandon Williams ("Williams") was a passenger in Boyd's truck. During the course of the chase, Boyd became enraged and began to pursue Spivey on Highway 9 at speeds sometimes exceeding 100 mph. At times, Boyd drove his vehicle dangerously close to the rear of Spivey's vehicle.

22. After Spivey attempted to "brake check" Boyd to discourage the pursuit and Boyd's dangerously close distance, Boyd began, without imminent threat to his person or anyone else, to unlawfully pursue Spivey even more aggressively.

23. At approximately 5:54 p.m., Boyd called Horry County 911, telling the dispatcher, . . . "he's trying to run from me now . . . I'm going to stay with him the whole way . . . We pulled our guns out . . . I'm staying with him . . . Listen, this dude shoots at me, we're going to put him down . . . Now we're behind him . . . Sir, if this guy aims that gun at me, we're going to have to shoot him . . . he's turning off the road. We're going to keep trying to follow him." At that time and all others, Spivey was not threatening any specific person nor was there any such imminent threat. Instead of discontinuing their pursuit of Spivey or waiting for law enforcement to intervene, Boyd and Williams continued to chase Spivey along Highway 9 into the Longs Section of Horry County, South Carolina, for an extended length of time.

24. Ultimately, after an extended high-speed chase, Spivey made a right hand turn onto Camp Swamp Road in the direction of his home in an effort to escape his pursuers and go home. Instead of continuing straight on Highway 9 to their intended destination of Loris, Boyd and Williams also turned right onto Camp Swamp Road, continuing their pursuit of Spivey until Spivey stopped his vehicle. When Spivey exited his vehicle, Boyd and Williams opened fire, emptying multiple rounds into Spivey and causing his death. Although Spivey fired his weapon after seeking cover inside his truck and after being mortally wounded by Boyd, neither Boyd, Williams nor Boyd's truck was struck by Spivey. Further, there was no objective evidence at the scene to support any claim that Spivey exited his vehicle, advanced upon the Boyd vehicle and then began firing his weapon. Nonetheless, Boyd and Williams immediately claimed that was what happened and saying they acted in self-defense.

25. Almost immediately after the shooting, Boyd called his lawyer from the scene. Minutes later, Boyd called Defendant Strickland, who at the time was Deputy Chief of HCPD and the executive commander of the Administration Bureau, which included the Criminal

Investigations function. Joseph Hill was then the Chief of Police. Subject to Chief Hill and such authority as Horry County retained through its County Administrator and other officials, Strickland possessed final and ultimate day-to-day supervisory and command authority over HCPD criminal investigations and the subordinate officers assigned to that function, including the investigation into Spivey's death. Boyd explained his version of events and his claim of self-defense directly to Strickland while Strickland occupied that command position.

26. Defendant Strickland was also a close friend of Boyd, a well-known businessman and restaurant entrepreneur in Horry County who treated members of HCPD at his restaurant. Moreover, that relationship between Defendant Strickland and Boyd was well-known to the other Defendants herein. While Defendant Strickland has attempted to downplay or outright misrepresent the closeness of his relationship with Boyd, Strickland's own words, as recorded by Boyd in phone calls between them from immediately after the shooting and continuing in the days following the shooting, tell quite a different story, examples of which include: (a) Strickland told Boyd it was "one of the hardest things … having a friend of mine go through something like that"; even though Boyd had just brutally murdered Spivey by shooting numerous rounds of ammunition at him and fatally wounding him, Strickland offered to lend Boyd a personal firearm from his or the County's "safe full" while Boyd's weapons were in possession of law enforcement; Strickland told Boyd to call him "any time, day or night," including 2:30 in the morning; Strickland and Boyd had previously hunted together and a photograph surfaced of Strickland, Boyd, Daniel Spencer, and Johanthan Rabon following an alligator hunt; Strickland mentioned eating with Boyd at his restaurant in the company of an unnamed "official." These details of the close relationship between Strickland and Boyd illustrate that the relationship was

much more than just casual and that the post-shooting actions and decisions were motivated by personal loyalty to Boyd rather than any legitimate police function.

27. Defendant Daniel Spencer was also a close personal friend of Weldon Boyd and Defendant Brandon Strickland. During the investigation, Spencer obtained information concerning the investigation and relayed that information to Boyd. Plaintiffs allege that Spencer's disclosure of investigative information to Boyd served no legitimate law-enforcement purpose, afforded Boyd preferential access to information about the investigation into his own conduct, and personally furthered the effort to protect Boyd from scrutiny and accountability and to help Boyd mitigate his exposure.

28. Upon information and belief, after receiving the initial phone call from Boyd, Defendant Strickland strategically and against protocol began making contact with the other Defendants herein, including but not limited to Alan Jones, M. Stephenson, and Mick Kathman, who then relayed the message and plan to other Defendants herein, to make sure that the "right" officers responded to the scene and knew to follow Boyd's narrative of "self-defense" and to violate protocol in any way necessary to ensure the narrative was not contradicted by any actual investigation in order to protect Boyd from any civil or criminal liability as a result of murdering Spivey.

29. Officer Higgs was first to arrive on scene, followed shortly thereafter by Officer Vescovi. Boyd, Williams and other witnesses and passersby were already on the scene. No effort was made to separate witnesses, to separate Williams and Boyd, to properly secure the site, to properly collect or secure evidence, or to determine the actual facts.

30. Just minutes after arriving on scene, before any investigation took place, and while Boyd was on the phone with his attorney, Officer Vescovi told Boyd that he thought they [Boyd

and Williams] would be okay. Vescovi then took the phone and discussed the situation with Boyd's attorney. Boyd continued to talk incessantly with witnesses and officers on scene. Shortly thereafter, Vescovi went to his patrol vehicle, retrieved a notepad, and wrote a note that he held up so Boyd and Williams could read it. After verifying whether or not Higgs' body-worn camera was on and sending Higgs in a direction away from Boyd and Williams so his camera and microphone would not record what was about to happen and repositioning his camera to a position he thought would not record what was written on the note, Vescovi held the note up so Boyd and Williams could read it. The note read, "Act like a victim. Camera." The purpose of Vescovi's writing the note was to prevent a spoken direction from being recorded by his body camera. What Vescovi failed to account for was that his body camera captured the message he wrote on the paper. Similarly, at one point, Officer Higgs told Boyd to stop talking and sharing information, other officers gave Boyd and Williams instructions to help the narrative, and then there was a coordinated effort for all officers on the scene to turn off their body cameras and/or audio to cover up and hide the surreptitious and illegal activities of law enforcement. As additional officers arrived and more phone calls and text messages were exchanged, the defendants continued to conspire together, through words, actions, silence, and the "good ole' boy culture" and formulated and continued a plan to protect Boyd from civil liability to the Plaintiff for the wrongful death of Spivey and any survival action of the Estate. These officers intentionally and knowingly ignored the evidence and facts clearly showing the stories of Boyd and Williams did not match the evidence but rather suggested they murdered Spivey and did not act in self-defense, including but not limited to the fact that Spivey made the conscious decision to turn off of Highway 9 onto Camp Swamp Road to disengage and escape the pursuit; Boyd and Williams made the conscious decision to chase Spivey and continue their pursuit onto Camp Swamp Road, even though their

intended destination required them to continue straight on Highway 9 and it was clear Spivey was attempting to get away from them; Boyd and Williams fired first and mortally wounded Spivey before he discharged his weapon; neither Boyd, Williams, nor Boyd's truck was struck by ammunition from Spivey's weapon; and the witnesses did not confirm or support Boyd and Williams' narrative that Spivey fired first. In fact, as officers continued to arrive on the scene, Defendant Strickland told Boyd in a phone call that Strickland had the "right" people coming to carry out the ends of the conspiracy.

31. Defendant Damon Vescovi personally authorized Boyd's attorney to enter the scene immediately after the shooting. Vescovi thereby permitted a representative of Boyd, one of the principal subjects of the investigation, to obtain physical access to the scene before the scene and its evidence had been fully processed, secured, and preserved. Plaintiffs allege that Vescovi's authorization further compromised the integrity and independence of the investigation and formed part of the preferential treatment afforded to Boyd.

32. Defendant Doug Dishong personally made and communicated the decision to turn off or disable the video recordings at the scene, including officers' body-worn-camera recordings and other available scene recordings. Plaintiffs allege that Dishong made this decision intentionally, while material events at the scene were ongoing, for the purpose and with the effect of preventing the creation and preservation of a complete audiovisual record of the officers' conduct, communications, handling of evidence, and interactions with Boyd and Williams. Dishong's decision personally furthered the concealment and evidence-manipulation alleged herein and impaired Plaintiffs' ability to obtain a complete and accurate record of the investigation.

33. The Defendants acted in furtherance of their conspiracy by also making the conscious decision to leave Spivey's body in his truck to bake in the extreme heat for an extended period of time and then towed Spivey's vehicle with his body still in the vehicle to a garage in violation of the law and all reasonable protocols, policies and procedures, all for the purpose of helping Boyd and Williams by having access to Spivey's vehicle in a private facility where planting and manipulating evidence would be undetectable, including placing a bottle of steroid pills in a compartment in Spivey's truck that was conveniently accessible through the shattered back glass which was not covered, without having to disturb the crime scene tape securing the doors. After baking the body, Defendants ordered an autopsy that was not at first recommended by the coroner in an effort to provide Boyd help in defending a civil action because Defendants knew the blood alcohol level would be elevated by leaving the body in the heat for an extended period. Defendants planted drugs in Spivey's vehicle while it was in their possession to make it appear that Spivey was on steroids and therefore an aggressor, even though the bloodwork showed no steroids in his system. They further misrepresented or omitted facts to the solicitor's/attorney general's office to prevent Boyd's and Williams' prosecution. They falsely represented that there were multiple witnesses who supported Boyd and Williams' claim of self-defense when in fact there were no witnesses who sustained those claims. They purposely and selectively turned off their cameras and audio for the purpose of hiding their conduct. They purposely mislabeled video evidence so it would not appear in the case file. They purposely misplaced the crime scene log and only "found" it two years later once Plaintiffs began asking and an internal affairs investigation was opened. Plaintiffs further allege that the treatment of Spivey's remains while the vehicle was in official custody was captured on video and that Plaintiffs and members of Spivey's family later learned of and viewed footage showing Spivey's body being violently

jostled and thrown about inside the vehicle as Spivey's truck was forcefully unloaded at the garage. Having to see this treatment of their deceased loved one made the indignity inflicted on Spivey's remains concrete and visible and caused additional anguish and emotional trauma, beyond the grief associated with his death itself, resulting in physical manifestations.

34. Defendant Mick Kathman, acting in his command role as Captain of HCPD's Criminal Investigation Division, went to the scene of the shooting and communicated with Defendant Brandon Strickland from the scene. Kathman personally made the decision to have Spivey's truck towed from the scene to the garage while Spivey's body remained inside the truck. Plaintiffs allege that Kathman exercised supervisory and command authority at the scene, coordinated his actions with Strickland, and personally directed the decision that resulted in Spivey's body being transported inside the truck rather than being removed and handled through ordinary procedures.

35. Defendant Matthew Stephenson also participated in and implemented the decision to leave Spivey's body inside Spivey's truck while the truck was towed from the scene to the garage. Stephenson was also responsible for securing Spivey's truck with evidence tape before it was towed. Although he undertook to ensure the truck's doors were sealed, Stephenson intentionally failed to seal the broken rear window, thereby leaving an unsecured point of access to the compartment in which drugs were later planted. Stephenson also personally observed a tablet or computer inside Boyd's truck but intentionally failed to seize or preserve that device, despite the existence of a search warrant authorizing the seizure of all electronic devices. Plaintiffs allege that Stephenson's decisions and omissions personally furthered the mistreatment of Spivey's remains, compromised the integrity of Spivey's truck and the evidence within it, permitted access through the unsealed rear window, and deprived the investigation and Plaintiffs

of potentially material electronic evidence from Boyd's truck, including a video of the actual shooting event and the chase.

36. Defendant John Sotile was the officer assigned and sent to Boardwalk Billy's to retrieve the available video footage depicting Scott Spivey on the day of the shooting in order to portray Spivey as a danger. Although additional responsive footage was available, Sotile intentionally failed to obtain the complete footage and instead retrieved only a selected portion of the video depicting Spivey which resulted in Spivey being portrayed in a bad light. Plaintiffs allege that Sotile's selective collection and omission of the remaining footage was intentional, deprived the investigative file of a complete and accurate video record, and furthered the effort to create and preserve the misleading allegation that Spivey was under the influence before the shooting, when the complete footage would have presented a more accurate account including that Spivey's receipt documented alcohol purchases for others and showed slow consumption over a long period of time while consuming food.

37. Defendant Mark Johnson intentionally mislabeled video evidence in the investigative file and personally participated in the manipulation and concealment of evidence. Upon information and belief, Johnson engaged in additional related misconduct, the full nature and extent of which will be developed through discovery. Johnson undertook these acts and omissions to facilitate and further the conspiracy and coordinated plan to protect Boyd and Williams, conceal the misconduct alleged herein, and compromise the integrity of the investigation.

38. Plaintiffs Deborah and Byron Spivey later learned that their son's body had been left in the truck, transported inside it, and subjected to the movement depicted on the garage video, and they viewed or were confronted with video depicting Spivey's body being violently jostled

and thrown about inside the vehicle as it was unloaded. They allege severe mental anguish and emotional distress, with physical manifestations, from learning what was done to their son's body, seeing the recorded treatment of his remains, learning that officers contemporaneously agreed to conceal that treatment from the family, and being forced to revisit those events while seeking truthful answers and accountability. Those injuries are alleged to be separate from the grief caused by Spivey's death itself.

39. The body-worn-camera record further reflects that, while Scott's body remained in the truck and the truck was being handled and transported in official custody, officers discussed the need to make sure that no one told Spivey's family that his body had been left inside the truck when it was towed. Plaintiffs allege that this contemporaneous effort to keep the fact from the family demonstrates that the involved officers understood the treatment of Spivey's remains was extraordinary, improper, likely to cause the family severe distress, and something they wanted concealed due to its illegality. The concealment was therefore part of the alleged misconduct itself, not merely an innocent failure to volunteer information after the fact.

40. Unbeknownst to the Defendants while it was occurring, Boyd was recording his phone calls. These recorded calls reveal the conspiracy and acts in furtherance thereof as documented by Strickland's own words which illustrate the subversive and covert nature of not only Strickland's actions but the actions of all Defendants, each of whom followed the lead or direction of Strickland, since he was second in command at Horry County Police Department under Chief Hill, who was set to retire and be replaced by Strickland. Some of Strickland's most notable comments to Boyd include the following: (a) "I have the right people coming who need to be there."; (b) "This is Brandon and Weldon talking, never to be spoken of again – I called my people."; (c) Regarding his call to Solicitor Jimmy Richardson, Strickland commented, "Look,

here's the deal."; (d) "This is all me and you talking, this isn't county police talking to you."; (e) "I was in the shadows last night, I weren't there, but in the shadows."; (f) "I can't officially tell you this, but I'm going to tell you, y'all are good to go."; (g) Strickland represented that his next call after Boyd was Solicitor Richardson and that Boyd had been "taken care of."; (h)"I'm just glad it was a white guy [that you shot]," referencing that the hypothetical perception would have been worse had Spivey been Black. Strickland also disclosed inside information to Boyd including but not limited to the following: (a) Strickland told Boyd that the police had vehicle-study findings, that the autopsy was scheduled, what the autopsy would show, and had Boyd decide what testing would be done on the weapons to minimize the length of the investigation, predicting the case would be closed within "the end of the week easily" unless additional weapon testing was performed to determine "who won the prize" of killing Spivey.; (b) Strickland advised Boyd not to release any further statement until "the case has been cleared out as a justifiable homicide."; (c) Strickland reassured Boyd that "[i]f I thought you had something to worry about, I'd tell you . . . I'm telling you, you don't have nothing to worry about." Further, according to Strickland, he called Solicitor Jimmy Richardson on the night of the incident to make sure everything was taken care of for Boyd.

41. Further, Defendants Hill and Strickland, together with other HCPD personnel serving in command positions, intentionally misrepresented material facts and evidence to Solicitor Jimmy Richardson for the purpose of protecting Boyd and Williams from criminal prosecution and shaping the public narrative in favor of Boyd and Williams' claim of self-defense and to allow the spoilation/destruction of evidence related to Spivey's killing.

42. Upon information and belief, on the morning of Monday, September 11, 2023, the first business day following Spivey's killing, the supervisors and officers materially involved in

the Spivey matter, along with others, assembled for a command-level meeting concerning the investigation. The meeting included supervisory, command, and investigative personnel responsible for the investigation and officers who had participated in or assumed responsibility for material components of it and other interested person at the department who were close to Boyd. The purpose and effect of the meeting was not merely to exchange information or receive routine investigative updates. Rather, the assembled personnel collectively reviewed what had occurred, determined the direction the investigation would thereafter take, decided what investigative avenues would and would not be pursued, determined how evidence and competing accounts would be treated, and established the course by which the shooting would be investigated, characterized, documented, and presented to prosecuting authorities.

43. Upon information and belief, HCPD personnel serving in supervisory and command roles directed lower-ranking officers to "be nice" to Boyd and Williams. Through those orders, related statements, and their own conduct, the supervisory personnel made it apparent to subordinate officers that command personnel were attempting to help and protect Boyd and Williams and expected the investigation to be handled accordingly. Plaintiffs allege that the lower-ranking officers understood the command message and that it influenced their treatment of Boyd and Williams, their investigative decisions, and their handling and preservation of evidence. These directives and the conduct implementing them are further evidence that the alleged favoritism and investigative manipulation originated at, were communicated through, and were permitted by HCPD's supervisory and command structure rather than resulting from isolated acts of individual line officers.

44. Upon information and belief, the decisions reached at the September 11, 2023 command meeting were thereafter treated within HCPD as authoritative and controlling for the

Spivey investigation. The participating supervisors and officers collectively exercised the command and supervisory authority actually used by HCPD to determine the course of this particular investigation, and subordinate personnel thereafter implemented that selected course without meaningful independent review, reversal, or correction. The handling of the investigation after the meeting, including decisions concerning evidence, witnesses, investigative avenues, characterization of the shooting, and communications with prosecuting authorities, flowed from and implemented the course selected at that meeting.

45. Plaintiffs allege that the authority exercised by the September 11, 2023 command group was not merely advisory. By delegation, established command structure, custom, usage, and actual practice, the assembled supervisory and investigative personnel, including Defendant Strickland, exercised final and effectively unreviewed supervisory and decision-making authority over the day-to-day course of the Spivey investigation. To the extent Chief Hill, the County Administrator, or another County official formally retained authority to review or reverse those decisions, Plaintiffs allege that the selected course was permitted to proceed without meaningful intervention and was knowingly acquiesced in and/or ratified through the failure to correct it despite the information and materials available to command personnel.

46. When Plaintiffs discovered Boyd's recordings, the joint and concerted misconduct by and between these Defendants was uncovered. Upon information and belief, Plaintiffs did not and could not have discovered the full scope of Defendants' misconduct until they obtained the case file materials via subpoenas on or about July 23, 2024, November 5, 2024, March 13, 2025, and May 1, 2026, which revealed recording and other concealed evidence that was previously not available to them. Defendants' active concealment of their misconduct, including the suppression of Boyd's recordings and the mislabeling of evidence in the case file, equitably tolled any statute

of limitations until Plaintiffs' discovery of the concealed materials. Shockingly, these recordings were in the possession of Horry County Police Department and known to and accessible by all Defendants named herein once Boyd's and Williams' cell phones were downloaded; nonetheless, even once Defendants were in possession of all these recorded conversations proving the reprehensible conduct not only of Boyd and Williams but also of Strickland and the other Defendants, the Defendants suppressed and ignored the recordings as well as the conduct of Strickland so that no charges were brought against Boyd and Williams. This illustrates that the post-hoc decision to download Boyd's and Williams' cell phones was only to appease the family of Spivey and not to actually investigate the death of Spivey and the actions and conduct of Boyd and Williams. Only once Plaintiffs obtained the case file via subpoena and brought the recordings to the attention of the public did certain individuals in supervisory positions with HCPD institute an official investigation into the corruption that they had known about all along and had chosen to turn a blind eye. Shortly thereafter, both Defendant Strickland and Defendant Vescovi either resigned or were terminated and later an internal affairs investigation was undertaken by HCPD.

47. Defendant Alan Jones was personally responsible for handling and documenting material electronic evidence and phone-download information in the Spivey investigation. Jones instructed the first detectives at the scene not to interview Boyd or Williams, contrary to Horry County's standard investigative protocols, policies, and procedures. Jones also instructed and conspired with Defendant Brandon Strickland concerning what Strickland should say about the telephone calls Strickland received from Boyd while Boyd was still at the scene. Plaintiffs allege that this coordination was intended to control how those calls would be characterized or disclosed and to conceal their true nature, substance, and significance. Jones failed to catalog or list the triage report associated with the download of Spivey's phone, with the result that the investigative file

contained no report documenting that download. This was done in an attempt to hide speed information collected by Spivey's phone during the chase by Boyd which showed speeds in excess of 100 miles per hour. Jones also failed to upload evidence from the investigation into Evidence.com. Jones personally instructed Tamasi not to take the tablet observed in Boyd's truck into evidence, but instead to leave the device in Boyd's truck so that it would ultimately be returned to Boyd. Jones falsely told Ken Marcus that the downloads from Boyd's and Williams' phones would be analyzed by SLED, and made that representation so that the downloads would not be analyzed by Horry County personnel. Jones was responsible for reviewing the data extracted from Boyd's and Williams' phones. Plaintiffs plead in the alternative that Jones either failed to perform the required review or performed the review and intentionally failed to document, report, or disclose the material information he found. In either event, Jones falsely represented to officials that Boyd's and Williams' phones contained no information relevant to the investigation. Jones further participated with Defendants Greg Lent and Brandon Strickland in a conversation concerning how information could be excluded from the phone downloads. Plaintiffs allege that Jones's acts and omissions were intentional, prevented ordinary cataloging, preservation, review, and disclosure of material electronic evidence, and personally furthered the concealment and selective handling of evidence alleged herein.

48. Defendants Greg Lent and Mick Kathman were personally responsible for handling communications concerning the Spivey investigation with SLED and the South Carolina Attorney General's Office. In those communications, Lent and Kathman misrepresented both the existence and the context of the telephone calls between Boyd and Defendant Brandon Strickland. Lent and Kathman also participated in the decision to leave the tablet and phones with Boyd's attorney rather than seize, secure, preserve, and place those devices into evidence. Plaintiffs allege that

subordinate HCPD personnel questioned Lent and Kathman about why Boyd's and Williams' phones had not been seized at the scene in accordance with standard procedure and why no comprehensive search warrant had been obtained to authorize a complete forensic download of those phones. Lent and Kathman ignored those questions and took no corrective action to secure the devices or obtain the necessary warrant. Jones, Lent, and Kathman also intentionally concealed the formal interview of Defendant Brandon Strickland by assigning the interview an inaccurate or misleading label in the investigative file, thereby causing the interview not to be readily identifiable or accessible to persons reviewing the file so as to not draw attention to Boyd's phone. Plaintiffs allege that their misrepresentations deprived the outside reviewing and prosecuting agencies of accurate material information and that their decision concerning the devices left potentially critical electronic evidence outside law-enforcement custody and control. Lent's and Kathman's acts and omissions personally furthered the selective presentation, concealment, and failure to preserve evidence alleged herein.

49. Defendants Joseph Hill, Greg Lent, Mick Kathman, and Brandon Strickland jointly decided to misrepresent to SLED the nature and scope of the assistance HCPD was requesting. In reality, HCPD asked SLED to perform only one narrowly defined task: examine Boyd's and Williams' cell phones for a video recording of the shooting. Hill, Lent, Kathman, and Strickland intentionally limited the assignment communicated to SLED while positioning themselves to claim later that HCPD had transferred to SLED all responsibility for the investigation. Plaintiffs allege that they structured and mischaracterized SLED's involvement for the purpose of creating plausible deniability for HCPD and themselves. Hill and Lent personally misrepresented to SLED the scope of SLED's requested involvement. Lent, Kathman, and Strickland also allowed the phones to remain outside law-enforcement custody and control, in the possession or control of

Boyd, Williams, or their representatives, and thereby permitted information stored on the phones to be altered, changed, or redacted before the devices and their contents were properly secured and preserved. Their conduct personally furthered the concealment, manipulation, and selective presentation of material electronic evidence alleged herein.

50. Chief Joseph Hill and the Defendants serving in supervisory and command roles had actual or constructive access to the body-worn-camera footage, investigative records, case-file materials, and, once obtained by HCPD, the downloaded recordings from Boyd's phone. Plaintiff alleges that these materials, together with the involvement of a Deputy Chief in directing the investigation of a close personal friend, supplied obvious grounds for supervisory review and intervention, yet no timely corrective action was taken before Plaintiff independently uncovered and exposed the misconduct.

51. On June 3, 2024, Plaintiff PR, as the Personal Representative of the Estate, filed a civil lawsuit against Boyd and Williams arising out of the wrongful killing of Spivey including survival claims based on theories of civil assault and battery and a wrongful death claim based on a negligence theory. The civil action is currently pending in the Horry County Court of Common Pleas with civil action number 2024-CP-26-03798.

52. In the underlying action, Boyd and Williams moved to dismiss all causes of action, claiming immunity from civil liability based on the actions and/or inactions of Defendants herein in addition to citing to the factually erroneous statements made by various defendants regarding the evidence and the case. The motion to dismiss required a full-blown, nearly week-long immunity hearing. Although Plaintiff PR prevailed, Boyd and Williams have moved for reconsideration and will likely appeal at some point. Moreover, the wrongful conduct of the

Defendants in aiding and abetting Boyd and Williams caused Plaintiff PR to incur significant costs she otherwise would not have incurred.

53. At all relevant times during the September 9, 2023 shooting and the ensuing investigation through October 2024, Defendant Joseph Hill was the Chief of Police for HCPD and exercised ultimate departmental command authority over HCPD personnel. Defendant Brandon Strickland was a Deputy Chief and the executive commander of the Administration Bureau, which included Criminal Investigations, and possessed final and ultimate day-to-day supervisory and command authority over that investigative function, subject to Chief Hill and authority retained by Horry County. Upon information and belief, Strickland was anticipated to replace Hill and participated as a principal command decisionmaker in the September 11, 2023, meeting at which the assembled supervisors and investigators established the course the Spivey investigation would thereafter take.

54. Upon information and belief, Defendant Hill was responsible, during his tenure as Chief, for supervision and command accountability within HCPD and for enforcing HCPD policies governing criminal investigations, crime-scene integrity, body-worn cameras, preservation of evidence, witness separation, truthful reporting, conflicts of interest, and internal accountability. Plaintiff further alleges that Hill had authority to review, restrict, correct, or countermand the conduct of subordinate command personnel, including Strickland.

55. Upon information and belief, before and after September 9, 2023, Defendant Hill had actual and/or constructive knowledge of a pervasive and unreasonable risk of constitutional injury arising from serious investigative and policy violations by HCPD personnel, including but not limited to failures involving body-worn cameras, crime-scene and evidence-preservation requirements, witness handling, truthful reporting, conflicts of interest, the conduct of officers who

had previously been the subject of internal investigations or corrective action and Boyd's connection to many high ranking officers within the department. Plaintiffs allege that the events described herein presented additional and obvious warning signs requiring command-level review and intervention.

56. While employed by HCPD and prior to the events described herein, Defendant Vescovi was the subject of other internal investigations, including one for improperly brandishing a backup weapon and engaging in a chase with another suspect in his patrol vehicle for which he was found to have engaged in conduct unbecoming, another for detaining an individual without legal justification for which he was ordered to complete de-escalation training, and, upon information and belief, other instances involving purposeful deactivation of body-worn-camera or recording devices. Plaintiffs allege that despite this history, Chief Hill and HCPD failed to impose safeguards, heightened supervision, or other measures sufficient to prevent recurrence, contributing to a custom or practice in which serious policy violations could occur without meaningful accountability.

57. Upon information and belief, Defendant Hill's actual or constructive knowledge is shown by, among other things, his position as Chief of Police during the relevant investigation, his authority over the command structure through which Strickland and the other Defendants acted, the number and obviousness of the alleged violations, the involvement of multiple officers and supervisors, prior internal matters, body-worn-camera footage, crime-scene materials, case-file irregularities, and the recorded communications and other investigative materials available to HCPD during Hill's tenure.

58. Upon information and belief, Horry County, acting through HCPD and its authorized policymakers, command personnel, and supervisory officials, allowed a pattern,

practice, custom, and usage to develop and continue under which repeated constitutional violations and investigative misconduct were permitted to go unchecked, especially with respect to, but not limited to, Defendants' conduct in coaching witnesses, attempting to avoid camera/audio capture, manipulating evidence and investigative narratives, failing to preserve the integrity of the scene, and participating in the cover-up alleged herein.

59. Upon information and belief, the violations alleged herein were not isolated mistakes, but were the predictable result of HCPD's customs, practices, failures of supervision, failures of discipline, failures of training, ratification of misconduct, and deliberate indifference to the obvious consequences of allowing repeated violations to go uncorrected.

## FIRST CAUSE OF ACTION FOR VIOLATION OF FEDERAL CIVIL RIGHTS (JOINT ACTION AND CONCERTED MISCONDUCT TO OBSTRUCT MEANINGFUL ACCESS TO THE COURTS AND IMPAIR PROTECTED LITIGATION INTERESTS— BY THE PERSONAL REPRESENTATIVE AGAINST THE INDIVIDUAL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES)

60. At all times complained of in this complaint, the Defendants were acting under the color or pretense of South Carolina state law, customs, practices, usages, and/or policy.

61. S.C. Code Ann. § 15-51-10 provides as follows:

> Whenever the death of a person shall be caused by the wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, although the death shall have been caused under such circumstances as make the killing in law a felony. In the event of the death of the wrongdoer, such cause of action shall survive against his personal representative.

62. S.C. Code Ann. § 15-51-20 provides as follows:

> Every such action shall be for the benefit of the wife or husband and child or children of the person whose death shall have been so caused, and, if there be no such wife, husband, child or children,

> then for the benefit of the parent or parents, and if there be none such, then for the benefit of the heirs of the person whose death shall have been so caused. Every such action shall be brought by or in the name of the executor or administrator of such person.

63. Pursuant to the above-referenced South Carolina statutes and the applicable common law, because Spivey died without a spouse or children, his mother and father are his statutory beneficiaries.

64. As the statutory beneficiaries of their deceased son, Spivey's parents have a wrongful death civil cause of action against Boyd and Williams for causing the death of their son by wrongful act, neglect and/or default. Further, pursuant to the above-referenced statute, the wrongful death action had to be brought by Jennifer Spivey Foley, the Personal Representative of the Estate, for the benefit of the statutory beneficiaries.

65. Further, under S.C. Code Ann. § 15-5-90, Plaintiff PR has a survival cause of action against Boyd and Williams for the damages Scott Ryan Spivey suffered as a result of the assault and battery on his person by Boyd and Williams prior to Spivey's death. This action survives to the Estate under S.C. Code Ann. § 15-5-90 and had to be brought by Plaintiff PR, as the Personal Representative of the Estate, for the benefit of the lawful intestate heirs of the Estate, namely Deborah and Byron Spivey.

66. As set forth above, a lawsuit asserting both the wrongful death and survival claims was filed and is pending in the Horry County Court of Common Pleas with case number 2024-CP-26-03798.

67. To the extent this claim is treated as a backward-looking denial-of-access claim, the Personal Representative alleges that the official misconduct caused litigation injuries and losses not fully remediable in the underlying wrongful death and survival actions against Boyd and Williams, including but not limited to: the permanent loss of the video recording of the

shooting from Boyd's tablet, which was never seized; the destruction or alteration of electronic communications between Boyd and Williams; the contamination of blood-alcohol and toxicology evidence through the deliberate exposure of Spivey's body to extreme heat; the loss or degradation of other material evidence; the diminished practical enforceability and settlement value of those claims; and extraordinary litigation expense and delay incurred solely to discover and overcome the official concealment. To the extent the underlying action remains capable of further relief, the Personal Representative alternatively alleges an ongoing or forward-looking obstruction claim based on continuing concealment, mislabeling, non-preservation, and resistance that must be removed or remedied for the underlying action to proceed on a truthful evidentiary record.

68. The underlying civil claims are nonfrivolous and presently pending. The Personal Representative alleges that Defendants' conduct has made those claims materially more difficult and expensive to investigate and prove and, as to evidence that was destroyed, altered, fabricated, concealed until it lost utility, or allowed to disappear, has permanently deprived the underlying action of material evidence that cannot now be recreated. The alleged injury is not the failure to obtain a criminal prosecution; it is the impairment of the Estate's and beneficiaries' ability to obtain complete civil judicial redress against Boyd and Williams.

69. Plaintiff PR's civil wrongful death and survival claims against Boyd and Williams are choses in action which are property rights created by and existing by virtue of South Carolina statutory and common law. As state created property rights, the choses in action are property protected by the guarantees of the Constitution of the United States of America and its Amendments, namely the Fourteenth Amendment, which provides Plaintiff PR a right to be free of the deprivation of property without due process of law.

70. Further, Plaintiff PR, as personal representative of the Estate of Spivey and the representative of the statutory beneficiaries of the wrongful death claim(s), has a right guaranteed by the Constitution of the United States of America and its Amendments to petition the government through the courts to redress grievances and to the fair and speedy administration of justice through the civil justice system.

71. During all relevant times herein, Defendants were aware of Plaintiff's constitutional rights set forth above.

72. As described herein, the Defendants combined together and orchestrated a plan, through words, actions, and silence, to protect Boyd and Williams from civil liability to Plaintiff PR by harming and thwarting Plaintiff PR's ability to successfully prove the survival and wrongful death claims against Boyd and Williams. The Defendants positively and tacitly came to a mutual understanding to accomplish the common and unlawful plan to create false evidence, allow the destruction of evidence, hide actual evidence, create false narratives, and then cover up their wrongdoing, all in an effort to protect Boyd and Williams from being liable to Plaintiff PR for monetary damages and to help them avoid criminal charges.

73. The Defendants acted in concert in furtherance of their joint and concerted misconduct, with the specific intent to deprive Plaintiff PR of meaningful access to the courts, the combination of which resulted in the deprivation of Plaintiff PR's constitutional rights in property without due process of law; the deprivation of Plaintiff PR's ability to successfully access the courts without great cost; obstruction of Plaintiff PR's ability to obtain accurate and complete evidence necessary to pursue legal redress for the death of Spivey; and intentionally frustrated and impeded Plaintiff PR's attempts to seek legal redress, in the following ways:

a. In intentionally failing to reasonably pursue the investigation into the death of Spivey to the fullest extent as follows:

i. In failing to seize cell phones at the scene;

ii. In failing to seize and secure all electronic devices in Boyd's truck including the tablet that recorded the shooting;

iii. In failing to ensure SLED processing of the murder weapons;

iv. In returning the murder weapons to Boyd and Williams without the weapons being processed;

v. In returning munitions/suppressors to Boyd and Williams without legal verification;

vi. In allowing the destruction of relevant evidence including but not limited to the video of the chase and shooting of Spivey and the Facebook messages between Boyd and Williams about the killing of Scott Spivey;

b. In intentionally failing to properly secure the scene:

i. In failing to properly supervise the scene and evidence collection/retention according to applicable Horry County Police Policy;

ii. In purposely and unsatisfactorily managing the scene;

iii. In violating Crime Scene Reporting Procedures including on-scene responsibilities, 21-5 (B-1d); isolating and preserving the crime scene (B-9b); and identification and interview of witnesses (B-12a);

iv. In failing to properly maintain the Crime Scene Entry Log in violation of 21-5 (B-8);

c. In intentionally failing to separate the witnesses; in failing to separate Boyd and Williams; and in allowing all parties to move about freely and converse with each other; all in violation of Policy 21-5 (B-12) which expressly requires that "witnesses must be isolated from one another and advised not to discuss the event with others."

d. In intentionally disabling body cameras/microphones including but not limited to Vescovi prompting Higgs to shut off his camera in an attempt to hide the "Act like a victim" note and to hide the location of the crime scene log;

e. In instructing Boyd and Williams not to talk or share information including but not limited to the following:

i. In Strickland telling Boyd to keep his mouth shut and stay out of sight until the Defendants could close out the case;

ii. In Strickland telling Boyd to stay quiet until this is over and to give it enough time so that Spivey's family doesn't think Defendants rushed the investigation;

iii. In the immediate aftermath of the shooting, Strickland telling Boyd, "That keeps it clean" and "you're gonna be fine."

iv. In Strickland telling Boyd repeatedly to log out of social media and stay off of it and to not release any statement until the case has been cleared out as a justifiable homicide;

f. In Vescovi writing and showing a note to Boyd and Williams to act like a victim and reminding them that cameras were recording, all in an effort to prevent a voice instruction from being recorded—after asking Higgs if his body camera was running and directing Higgs in the opposite direction of Boyd and Williams and positioning his body camera in what he thought was out of view of the message;

g. In intentionally leaving Spivey's body in the truck in high temperatures for an extended period of time;

h. In transporting Spivey's vehicle from the scene to a garage with the body in the truck which Strickland acknowledged is unusual and with the ulterior purpose as explained by Strickland to preserve evidence "under light" so it could be "document[ed] as you go and paint the picture in a better light";

i. In planting drugs in Spivey's truck;

j. In handpicking officers/detectives to send to the scene to ensure the plan was carried out and/or steering the investigation through pre-arranged channels; in Strickland using his pre-existing knowledge of who was on call to telegraph to Boyd that a sympathetic investigator (described by Strickland as a "good ole' boy" and his "people") was coming, and in calling the CID captain and the solicitor in succession to insert his influence into the investigation;

k. In intentionally mishandling and desecrating Spivey's body in violation of S.C. Code Ann. § 16-17-600 in order to create an artificially inflated blood

alcohol level and then ordering an autopsy to help Boyd and Williams create a defense to a civil action by Plaintiff;

l. In Strickland improperly inserting himself into the autopsy decision as evidenced by Strickland's own words to Boyd: "This is all me and you talking this isn't a county police talking to you, ok" and proceeding to claim that he had personally pushed for an autopsy "to cover [Boyd] if a civil suit ever came down the line; "originally the coroner . . . initially they weren't even going to do an autopsy on the guy. I was like, 'No, you all need to do one to cover it in case a civil suit comes down the line, just to cover you.'"

m. In misrepresenting facts to the solicitor/attorney general's office to influence the attorney general not to prosecute Boyd and Williams, as evidenced, among other things, by Strickland's own admission to speaking to people "in the shadows" and relaying to Boyd assurances from the solicitor's office that Boyd and Williams would not be prosecuted;

n. In intentionally producing only a portion of the seven hours of video footage obtained from Boardwalk Billy's where Spivey spent time prior to the incident in order to create and sustain an allegation that Spivey was under the influence, when the complete footage painted a more accurate picture;

o. In falsely representing that there were multiple witnesses when none of the "witnesses" actually sustained the narrative;

p. In suppressing or hiding Boyd's recorded calls;

q. In intentionally coaching and giving instructions to Boyd and Williams at the police station and intentionally leaving the door to Boyd's and Williams' rooms open so they were able to hear the conversation and questions in each room and be consistent with their answers and explanations;

r. In intentionally altering a pdf document of the "on-call" schedule after receiving a FOIA request for the document to make it appear Alan Jones was on the schedule for 9/9/23;

s. In allowing the destruction of Weldon Boyd's video of the killing: and

t. In causing compensable injury to the Personal Representative's ability to obtain meaningful judicial redress, including extraordinary litigation expense, delay, burden, and the loss, degradation, or diminished utility of material evidence. The separate emotional injuries arising from the treatment of Spivey's remains are alleged below by Spivey's parents in their individual capacities and are not pleaded here as a substitute for the required actual injury to judicial access.

74. The acts and omissions by these Defendants violated Plaintiff PR's constitutional rights.

75. At all times relevant to this action, these Defendants knew or should have known of the wrongfulness of their conduct and the risk of substantial harm to Plaintiff PR, but they repeatedly violated Plaintiff PR's constitutional rights despite that knowledge.

76. Before and after Plaintiff PR instituted the civil action in the Horry County Court of Common Pleas, the individual Defendants allegedly knew that the concealment, destruction, fabrication, mislabeling, and manipulation of material evidence would impair Plaintiff PR's ability to investigate, plead, prove, and obtain a remedy on her wrongful-death and survival claims and hurt Scott Spivey's family.

77. Despite having the notice and knowledge that the Plaintiff PR's constitutional rights were being violated, the Defendants continued to conspire to impede, hinder, obstruct and defeat the due course of justice with the intent to deny Plaintiff PR her rights and harm the Spivey family.

78. As a direct and proximate result of the acts and omissions alleged herein, Plaintiff PR has incurred and continues to incur substantial litigation expense, delay, frustration, and burden in uncovering evidence and litigating issues created by Defendants' misconduct; has suffered impairment and diminution in the value and practical enforceability of the Estate's wrongful-death and survival claims through alleged spoliation, fabrication, concealment, and destruction of evidence; and has suffered mental anguish, humiliation, anger, distress, and emotional suffering caused by the alleged constitutional misconduct itself, including the additional anguish and trauma of discovering the alleged intentional mishandling and desecration of Spivey's body and the use of his remains and postmortem evidence to assist the persons responsible for his death. These

emotional injuries are alleged as separate and distinct from the grief naturally caused by Spivey's death and as consequential injuries of Defendants' own unconstitutional conduct. Plaintiff PR alleges these injuries constitute actual injury to her ability to obtain meaningful judicial redress and compensable harm proximately caused by Defendants' conduct, not merely dissatisfaction with the adequacy of a criminal investigation or the absence of criminal charges. Plaintiff PR further alleges that Defendants' continuing concealment, obstruction, and resistance forced her to remain engaged in an adversarial struggle to discover what occurred and obtain accountability, thereby prolonging and compounding the emotional suffering and interfering with the family's ability to grieve and begin healing from Spivey's death. This alleged injury is not the grief caused by Spivey's death itself, but the additional harm caused by being repeatedly required to confront alleged misconduct by the public officials charged with investigating that death. Plaintiff PR's emotional-distress damages further include the anguish and recurring trauma associated with learning of and viewing the video depicting the treatment of Spivey's body while his vehicle was being unloaded, and the additional burden of having to revisit that footage and its implications in the course of seeking truthful answers, pursuing legal redress, and holding the responsible public officials accountable.

**<u>SECOND CAUSE OF ACTION FOR VIOLATION OF FEDERAL CIVIL RIGHTS</u>**
**42 U.S.C. § 1983**
**(SUPERVISORY LIABILITY AGAINST DEFENDANT JOSEPH HILL IN HIS INDIVIDUAL CAPACITY)**

79. Plaintiffs repeat, reallege, and incorporate by reference each and every allegation set forth above as if fully set forth herein.

80. This cause of action is brought against Defendant Joseph Hill in his individual capacity for supervisory liability under 42 U.S.C. § 1983 during the period in which Hill served as Chief of Police. Plaintiff PR does not seek to hold Hill liable under a theory of respondeat superior,

but for his own alleged deliberate indifference, tacit authorization, failures of supervision and discipline, and affirmative causal connection to the constitutional injuries alleged herein.

81. At the time of the Spivey shooting and throughout the ensuing investigation until his retirement in October 2024, Defendant Hill was Chief of Police and the highest-ranking HCPD command officer. Strickland, as Deputy Chief and executive commander of the bureau encompassing Criminal Investigations, was directly within the command structure headed by Hill. Plaintiff PR alleges that Hill had actual and/or constructive knowledge of a pervasive and unreasonable risk of constitutional injury arising from the conduct alleged herein, including through the involvement of command personnel, the body-camera and audio record, investigative irregularities, prior policy breaches and internal matters, case-file materials, and the recorded communications available to HCPD.

82. The Fourth Circuit's 2026 decision in *Bolick v. Anderson*, 169 F.4th 528 (4th Cir. 2026), confirms that supervisory liability under § 1983 requires proof that the supervisor had actual or constructive knowledge that the subordinate's conduct posed a pervasive and unreasonable risk of constitutional injury; that the supervisor's response showed deliberate indifference to or tacit authorization of the offensive practices; and that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

83. Defendant Hill's response to the pervasive and unreasonable risk described herein was so inadequate as to show deliberate indifference to, tacit authorization of, and/or acquiescence in the unconstitutional conduct of his subordinates. Upon information and belief, Hill failed to take reasonable steps to supervise, restrict, remove, investigate, discipline, or otherwise control Strickland, Vescovi, and the other subordinate Defendants despite the alleged warning signs,

command-level involvement, and foreseeable risk that their conduct would impair Plaintiffs' constitutional rights.

84. Plaintiff PR further alleges that Hill failed to enforce reasonable policies, procedures, supervision, conflict-of-interest safeguards, and discipline sufficient to prevent HCPD command personnel and investigators from using personal relationships, command influence, body-worn-camera manipulation, evidence mishandling, witness coaching, and investigative irregularities to protect favored persons from civil or criminal liability.

85. Defendant Hill's alleged deliberate indifference and tacit authorization were a moving and proximate cause of the injuries alleged herein because the absence of meaningful command review allegedly allowed Strickland to use his command position and personal relationship with Boyd to influence the investigation and allowed Vescovi and others to engage in the acts and omissions described above without timely correction or accountability.

86. As a direct and proximate result of Defendant Hill's supervisory conduct and failures, Plaintiff PR suffered the deprivation of rights secured by the United States Constitution and federal law, including but not limited to deprivation of protected property interests without due process, denial and obstruction of meaningful access to the courts, impairment of Plaintiff's wrongful death and survival claims, spoliation and fabrication of evidence, costs and expenses incurred to uncover Defendants' misconduct, emotional distress, and other damages to be proven at trial.

87. Defendant Hill's conduct was intentional, willful, reckless, malicious, and/or in callous disregard of Plaintiff PR's federally protected rights, entitling Plaintiff PR to actual damages, consequential damages, punitive damages, attorneys' fees and costs under 42 U.S.C. § 1988, and all other relief allowed by law.

**THIRD CAUSE OF ACTION FOR VIOLATION OF FEDERAL CIVIL RIGHTS**
**42 U.S.C. § 1983**
**(*MONELL* LIABILITY AGAINST DEFENDANT HORRY COUNTY)**

88. Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth above as if fully set forth herein.

89. This cause of action is brought against Defendant Horry County pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Horry County is the political subdivision responsible for HCPD. HCPD is a department of Horry County and is referenced in this cause of action only as the police department through which Horry County and its authorized personnel acted; HCPD is not separately sued.

90. At all relevant times, Horry County was the governmental entity responsible for HCPD. Horry County, acting through the County Administrator and any other officials vested by state or local law with final policymaking authority, retained governmental authority over HCPD and the appointment, supervision, and accountability of its Chief of Police. Within HCPD, Chief Joseph Hill possessed ultimate departmental command authority during the investigation at issue, while Deputy Chief Brandon Strickland possessed final and ultimate day-to-day supervisory and command authority over the Administration Bureau and its Criminal Investigations function, subject to Hill and the authority retained by Horry County.

91. Plaintiff PR alleges in the alternative that Horry County delegated to bureau-level and investigation-specific command personnel, including Strickland and the supervisory group assembled on September 11, 2023, authority to make and implement decisions controlling the course of the Spivey criminal investigation without meaningful contemporaneous review; knowingly permitted those decisions to function as effectively final within HCPD for this particular investigation; and/or maintained, permitted, tolerated, or ratified a custom or usage, as

demonstrated by prior incidents of investigative misconduct and failures of accountability known to HCPD-including but not limited to the prior internal investigations involving Defendant Vescovi and other instances of body-worn-camera manipulation, evidence-handling irregularities, and failures of discipline known to HCPD command-under which investigative and command personnel could steer investigations for personal reasons, protect favored persons from civil or criminal accountability, manipulate investigative narratives, disable or circumvent body-camera and audio recording, mishandle or conceal material evidence, fail to separate witnesses, and communicate false or misleading information to prosecuting authorities without timely discipline or correction.

92. Plaintiff PR alleges that Strickland did not merely offer advice as an uninvolved officer. As the Deputy Chief commanding the Bureau that included Criminal Investigations, he allegedly selected or influenced the personnel assigned to the matter, directed or influenced subordinate officers, represented to Boyd that investigative and charging decisions would come through him, and exercised the authority of his office to shape the investigation. Plaintiff further alleges that Strickland participated as a principal command decisionmaker in the September 11, 2023 meeting at which the assembled supervisory and investigative personnel collectively selected the course of action that would govern this particular investigation. As a matter of actual practice, those decisions were implemented by subordinate personnel and were not meaningfully reviewed, reversed, or corrected by higher HCPD or County authority.

93. Plaintiff PR further alleges that the challenged conduct was attributable to Horry County under one or more independent and alternative *Monell* theories: (a) an established custom or usage; (b) deliberately indifferent failures of training, supervision, discipline, and conflict-of-interest enforcement; (c) delegation of effectively final operational and investigation-specific

authority to command personnel whose decisions were not meaningfully reviewed; (d) the collective selection, at the September 11, 2023 command meeting, of the course of action thereafter implemented in this particular investigation; and (e) ratification, knowing acquiescence, or approval by officials possessing authority to review and correct those decisions. These theories are pleaded in the alternative to the extent the identity or scope of a final policymaker is determined by state or local law.

94. Plaintiff PR alleges actual or constructive municipal notice from the number, nature, and obviousness of the alleged violations; the involvement of command personnel; the September 11, 2023 command meeting at which the investigative course was selected; prior internal investigations and policy breaches; body-camera footage and audio; irregularities in the case file and crime-scene log; and the recorded communications available to HCPD. Despite that notice, Horry County, acting through HCPD and its command structure, allegedly failed to undertake timely, meaningful corrective action before Plaintiff PR independently obtained and exposed the recordings and other evidence. Plaintiff PR alleges that written policies were therefore insufficient because compliance was not made meaningful through enforcement, supervision, discipline, retraining, conflict screening, and reporting.

95. Plaintiff PR alleges that these municipal policies, customs, practices, delegations, investigation-specific command decisions, omissions, failures of training, failures of supervision and discipline, and ratification or tolerance of misconduct were the moving force behind the constitutional injuries alleged herein. Plaintiff PR further alleges a direct causal link between the County's command and accountability structure, the course selected by the September 11, 2023 command group, and the ability of Strickland and the other individual Defendants to act with

apparent permission and impunity in manipulating the investigation and evidence in a manner that impaired Plaintiff PR's protected property interests and meaningful access to the courts.

96. As a direct and proximate result of the unconstitutional municipal policies, customs, practices, omissions, and deliberate indifference alleged herein, Plaintiff PR seeks compensatory and consequential damages, nominal damages if appropriate, reasonable attorneys' fees and costs under 42 U.S.C. § 1988, and all other relief allowed by law. Plaintiff PR does not seek punitive damages against Horry County. The compensatory and consequential damages sought against Horry County include the mental anguish and emotional distress proximately caused by the municipal conduct alleged herein, including the additional trauma associated with the treatment of Spivey's remains and Plaintiffs discovery of and exposure to the video depicting that treatment.

**FOURTH CAUSE OF ACTION FOR VIOLATION OF FEDERAL CIVIL RIGHTS**
**42 U.S.C. § 1983**
**(DEPRIVATION OF SCOTT SPIVEY'S PARENTS' QUASI-PROPERTY INTEREST IN HIS REMAINS WITHOUT DUE PROCESS — AGAINST THE PARTICIPATING INDIVIDUAL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES AND, SEPARATELY, AGAINST HORRY COUNTY UNDER *MONELL*)**

97. Plaintiffs repeat, reallege, and incorporate by reference each preceding allegation as if fully set forth herein.

98. South Carolina law has long recognized that a deceased person's body is quasi-property of the person or persons entitled to custody and disposition of the body and that the protected interest includes the right to have the body treated with dignity and protected from mutilation, outrage, and indignity. Because Spivey died without a spouse or children, Plaintiffs Deborah and Byron, as his parents and next of kin, allege that they possessed the legally protected interest in the custody, protection, and dignified disposition of Spivey's remains.

99. The individual Defendants who, as specifically alleged herein, personally participated in, directed, approved, or knowingly facilitated the decision to leave Spivey's body

inside his truck to bake in extreme heat, transport the truck with his body still inside, handle and unload the vehicle in a manner that caused his body to be violently jostled and thrown about, or conceal those facts from his family—including Defendant Brandon Strickland, who acknowledged the unusual nature of the handling and directed the towing to the garage for evidentiary purposes; Defendant Mick Kathman, who personally made the decision to tow the truck while Spivey's body remained inside; Defendant Matthew Stephenson, who participated in and implemented that decision; and Defendant Doug Dishong, who directed the disabling of recordings during these events-acted under color of state law. Each such Defendant is sued in his or her individual capacity for his or her own acts and omissions. Plaintiffs do not seek to impose individual liability merely because of a Defendant's employment by HCPD, rank, presence at the scene, or supervisory position. Plaintiffs allege that the personal conduct attributed to each such Defendant was intentional, reckless, arbitrary, and conscience-shocking, was undertaken as part of the broader effort alleged herein to manipulate postmortem evidence and assist Boyd and Williams, and directly and proximately caused the deprivation and injuries alleged in this cause of action.

100. The body-worn-camera statements directing or encouraging officers to ensure that Spivey's family was not told that his body had remained inside the truck when it was towed are alleged as evidence of contemporaneous knowledge, purpose, concealment, and consciousness of wrongdoing. Plaintiffs allege those statements support the inference that the involved officers understood both the extraordinary nature of the treatment and the obvious likelihood that disclosure would cause Spivey's parents severe anguish.

101. Plaintiffs allege that the challenged deprivation resulted from coordinated and command-level decision-making rather than a random, unauthorized accident. To the extent pre-

deprivation process is relevant, Plaintiffs allege no emergency or legitimate governmental necessity required the challenged treatment or concealment and no constitutionally adequate process preceded the intentional deprivation. To the extent Defendants contend the conduct was random and unauthorized, Plaintiffs plead in the alternative that the conduct was so arbitrary, abusive of official power, conscience-shocking, and unrelated to a legitimate governmental objective as to violate the Fourteenth Amendment under the facts alleged.

102. With respect to the individual Defendants, this cause of action is asserted only against those officers whose personal participation, direction, approval, or knowing facilitation of the challenged treatment or concealment is specifically alleged herein. The liability of each such Defendant rests on that Defendant's own conduct under color of state law and the causal connection between that conduct and the deprivation of Spivey's parents' protected interest; it does not rest on collective liability, *respondeat superior*, or the acts of another officer.

103. Separately and independently, Plaintiffs assert this cause of action against Defendant Horry County under *Monell*. Plaintiffs do not seek to hold Horry County liable merely because it employed the individual Defendants. Rather, Plaintiffs allege that the challenged abuse and mishandling of Spivey's remains and subsequent concealment were caused by the County's policies, customs, usages, practices, delegated decision-making authority, investigation-specific command decisions, ratification or tolerance of misconduct, and deliberately indifferent failures of training, supervision, discipline, conflict screening, and enforcement, as more fully alleged above. Plaintiffs further allege that these municipal acts and omissions were the moving force behind, and had a direct causal connection to, the constitutional deprivation and injuries alleged in this cause of action. Horry County's liability under this cause of action is independent of, and does not depend upon, *respondeat superior* liability for the individual Defendants' conduct.

104. As a direct and proximate result, Plaintiffs Deborah and Byron Spivey suffered demonstrable mental anguish and emotional distress separate from the grief naturally caused by Spivey's death, including anguish from learning that his body was left in the truck to bake and then towed, seeing or being confronted with video of his body being violently jostled during unloading, learning that officers agreed to conceal the treatment from the family, and repeatedly confronting those facts while seeking accountability. They will offer specific evidence of the nature, duration, severity, physical and emotional manifestations, and effect of that distress as required by applicable law.

105. Plaintiffs Deborah and Byron Spivey seek compensatory and consequential damages against the persons and entities legally responsible, punitive damages against individual Defendants to the extent permitted by law, nominal damages if appropriate, reasonable attorneys' fees and costs under 42 U.S.C. § 1988, and all other relief allowed by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against the appropriate Defendants and grant the following relief:

a. Actual, compensatory, and consequential damages in an amount to be determined at trial for injuries proximately caused by the constitutional violations alleged herein, including the Personal Representative's access-to-courts injuries and injuries to her property interest in the choses in action and the parents' demonstrable mental-anguish and emotional-distress damages arising from the alleged deprivation of and damage to their rights in Spivey's remains;

b. Punitive damages against the individual Defendants only, to the extent permitted by law;

c. Reasonable attorneys' fees and costs recoverable under 42 U.S.C. § 1988; and

d. Such other and further relief as is allowed by law and that the Court deems just and proper.

**REQUEST FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury on all claims so triable.

GOODING AND GOODING, P.A.

By: s/ Mark B. Tinsley

Mark B. Tinsley, Fed. Bar No.7160
Laine Brabham Gooding, Fed. Bar No. 13207
P.O. Box 1000
Allendale, SC 29810
803-584-7676
mark@goodingandgooding.com
laine@goodingandgooding.com

-and-

s/John S. Nichols

John S. Nichols, Fed. Bar No. 2535
Bluestein Thompson Sullivan, LLC
Post Office Box 7965
Columbia, SC 29202
803-779-7599
john@bluesteinattorneys.com

-and-

s/ Natasha M. Hanna

Natasha M. Hanna, Fed. Bar No. 9306
Law Ofc. of Natasha M. Hanna, P.C.
4712 Jenn Dr., Suite A
Myrtle Beach, SC 29577
(843) 839-8002
natasha@nhannalaw.com

September 8, 2026 *Attorneys for Plaintiff*